We have before us today five different cases. Four cases are being argued, and one case has been submitted on the briefs. We consolidated the four cases of argument this morning, given their common issues. And let me make sure I have this right. And that's that appellant petitioner has 20 minutes in their direct and 10 rebuttal. Is that correct? That's correct, Your Honor. And then on the other side, same thing. We've got 20, 10, and five minutes we've allotted to the government. Is that correct? That's correct, Your Honor. Okay. Well, let's get going here. Mr. Conrad, you may proceed. Good morning. May it please the Court. My name is David Conrad. I'm representing the appellant, Luke Calypso. I'm going to focus my arguments today on two legal errors by the Board. The first issue is the written description issue for the 516 patent, where the parties agreed that the claim constructions for two terms, endorsement tag and token, was an executable link. The Board found that there is no question that there is an executable link described in the original specification. The second issue I'm going to speak about today is the issue of Paul and anticipation. There, the Board found that there is no express disclosure in Paul of the claimed invention, and it didn't find that the claimed invention was either inherent in Paul. And therefore, there's no anticipation, but yet the Board found anticipation anyways. I'm going to turn first to the issue of written description. Mr. Conrad, on that, what was the dialogue, if you will, before the Board on that? Because the cases seem to make it fairly clear that in a written description situation, you start out with claim construction. And then the question is, the claim is properly construed. Does the record show that the inventor was in possession of what is the construed claim? And we have these two definitions. We have this definition of token and endorsement tag. Was there discussion of claim construction between the Board and the parties? Because the Board didn't do any claim construction. I think you hit the key point, Your Honor, that the Board did not do claim construction on this issue. Did the parties urge them to? We did in the petition, or the petitioner did in their petition, Your Honor. They argued it was an executable link. In our response, we argued that claim construction was an executable link. The Board itself seemed to skip over that issue, seemed to jump right into the specification and do this backwards. They looked at the written description first, and it's a little unclear, but they seemed to want to jump from there and see if someone would divine in the abstract the term tag or token. So there was no discussion at the oral argument before the Board as to the proper claim construction, in other words, as to the parties saying to the Board, please adopt this construction? I think the Board didn't ask those questions, Your Honor. The parties agree on it, there's no dispute on what the claim construction should be, but the Board didn't seem to inquire about that issue. I think you hit on what may be the fundamental problem with the error in the Board. So it's your position that we can take the construction that was proposed, now there may be some questions from the other side on this, that was proposed at the Board, namely, what endorsement tag and token mean and executable link, right? Yes, yes. When you adopt the Board's, the parties' constructions, Your Honor, the Board already made the finding. They said that there's no question that the written description supports endorsement tag and token if there were a construction of executable link. Sorry, you're saying that the Board expressly said it had claim construction purposes? No, Your Honor. Endorsement tag and token mean hyperlink or executable link? They weren't explicitly clear that they used a construction like that for purposes of the 102 with Paul, but certainly with respect to the written description, they didn't go nearly as far as maybe what you were suggesting. Well, here's one thing they did say, Judge Shen. The Board said if the specification set forth the definition that tag meant an executable link such as a hyperlink, the written description requirement clearly would have been met. They said that on the page 37. Now, what the Board seemed to be saying there was the applicant had a requirement. If they were going to use a word that's not in the written description, the applicant had a requirement to expressly set forth a definition of that term. And here they said had that expressed definition been set forth, the written description requirement would have clearly been met. That itself is another error that the Board seemed to have made. I'm curious. Why did your side come up with these terms, endorsement tag and token? They're clearly nowhere in the written description. So why did you, midstream during prosecution, insert those otherwise unknown terms into the claims? That's a fair question, Your Honor. I don't think we can define any definition. So it's your client, right? Your client wrote these claims. Why did your client write those claims the way they wrote those claims? Yes, Your Honor. One thing that I can offer as a possible explanation is the original application was filed with one prosecuting attorney. And then midstream, the applicant switched to a different prosecuting attorney at a different firm. And that's when the claims were amended. And the only thing I can suggest is maybe it's a different style of prosecution and a different style of how an attorney operates. It's clear when you look at the claims, though, and how those two terms are used in the claims, what they do. In both cases, the user can execute them or interact with them in order to- Did the amendments to the claims occur before or after the CIP was filed? I'm sorry, Your Honor? There was a continuation in part application filed from the original application, right? And then the CIP had more explanation about endorsement tag and token. I'm not sure of the exact timing of the CIP, Your Honor. It is true there was a CIP filed during the pendency, and that was filed by the new prosecuting attorney. And it did add some additional embodiments, but the detail is not additional description of a link. It was more description about how this link was created, such as hashing. More technical details about a particular embodiment. The original disclosure itself describes a link, and even the board agreed that that concept, as it's claimed in the 516 patent, is supported. So, in the arguments that you made concerning 102 and 103, you did argue a certain construction, correct? Yes, Your Honor. What should be held to that construction with respect to 112? You mean before the board, the arguments for 102 and 103? Well, Bluclipso argued that the construction for those terms is an executable link, such as the hyperlink. And that's in agreement with the petitioner's proposal as well. So, we didn't feel the need for those 102 and 103 issues before the board to argue the executable link as the key issue on Mapplethorpe. So, that didn't really come up too much. But the fact remains, both parties agreed. We agreed with the petitioner on what the proper construction should be. One question. Can we decide the case, in your view, Mr. Conner, based upon what you say is the agreed-upon construction? Or is there any necessity for us to send it back to the board for the board to make a formal, clean construction determination? There's no need to send this back to the board. But you would agree the board hasn't said, here's the correct construction. Well, the board could implicitly accept this construction. It did analyze other issues in the petition. It analyzed 102 and 103 in front of the Paul records, for example. And in that analysis, the board necessarily already concluded that it must be an executable link because it made findings that Paul disclosed a hyperlink. And that was the basis for finding anticipation on some of these elements within Paul. So, the board's already done this. The board's already agreed with the parties and looked at the patent this way. And the board didn't seem to disagree with this particular decision. Maybe it's possible that the board simply just assumed without deciding for purposes of doing the 102 rejection. And I think I understand what you recognize as the tension and the logic between assuming a claim construction for purposes of one rejection and then concluding there's no good claim construction for another rejection. But I'm not so sure we can conclude from the fact that they did a 102 rejection that the board necessarily embraced the claim construction for purposes of the written description, given what they said on the written description rejection. I guess the follow-up on Judge Shull's question is, is it possible that we would need to remand on the written description question? Because assuming that you're right that there's a defect with the written description rejection, we need to hear more from the board as to what is it that endorsement tag and token really mean? And to the extent it means something, it has migrated away from the content of the written description. Or alternatively, should we just reverse if you are right? Because I guess in our view, anybody would know when you review the written description, the endorsement tag and token can really only mean one thing, i.e. executable link. I think your last point, Your Honor, is exactly on the money, and that's that reversal is appropriate here. There's nothing in the record that would suggest that an alternative construction would even be possible. Could there be another way of doing it, which is to say that maybe reversing the written description rejection? Because in our view, the other side just hasn't met their initial burden of proof. And so without actually getting to the heart of the merits of whether there is or is not written description, we would say because the other side needed to go further in making the case for written description, just because the claim uses different words, that alone is not good enough. They have to go further and say why those different words in the claim mean something different than what's in the spec. And then because that burden had not been met, and therefore the written description rejection cannot stand. That's right, Your Honor. That also would be a good reason to reverse and not have to remand. The burden of proof is on the petitioner, and the only evidence that they offer with respect to claim construction, with respect to the support in the written description, is that the words are not used in the written description. That's it. And that the law holds that the applicant can be their own lexicographer, and that to support the written description, you don't have to use the same words. Their expert didn't say anything about the meaning of token endorsement tag in this relevant field of art? No, that's a good point. Their expert said tag and token in the abstract. He said some things about that, but if you look at what he said, in no way did he actually do a claim construction analysis. He didn't look at the context of the patent and prosecution history and say, okay, I've got these ideas of tag and token, let me apply it and see what a proper construction is. That part he did not do. He simply just hedged and said a few things about it in the abstract, but there's no evidence of what that expert says of the proper claim construction, except what he admits in his deposition, which is that, yes, it is a proper claim construction for endorsement tag and token to be an executable link. Our expert agrees, and the petitioners agree, so there is really no dispute on claim construction, and nothing in the record would support something else. All that's left with the petitioners' burden that they tried to meet is the words are different, and that's it. Why don't you move on to the Paul reference? Thank you, Your Honor. As I said, there is no express disclosure in the Paul reference of the claimed invention, and the board found so. The board said several times that there was no – of two aspects of Paul that the petitioner argued would be used together, and that Paul did not indicate expressly that those two routines could be used together. If we agree with the board's finding that the Paul reference expressly discloses that one of ordinary skill – that what Paul is disclosing is not only just different routines, but that the routines can be combined together. If you think that it's disclosing, then would you agree at that point that what we have here is something that's very akin to Kenna Metal, and therefore the 102 is affirmable? No, Your Honor, for two reasons. One, the board didn't actually say that you can expressly combine – Paul expressly can combine these tools. In fact, it said – I agree with you that Paul doesn't say that you can combine the refer a friend routine with the direct email marketing campaign routine, but the board nevertheless did find that Paul expressly disclosed that the various routines that Paul discloses, Paul says you can combine them. There's some boilerplate to that effect, but let's assume for a second that you can combine – it does say you can combine refer a friend tool with the direct email campaign tool that targets users. That still would not be enough, and the reason is, is petitioner's argument actually requires modifying what Paul discloses as the refer a friend tool with aspects of the campaign manager. It doesn't simply say use this tool and then combine it with this tool. In fact, if you use the refer a friend tool, what you'll do is you'll create an email, and then Paul describes sending that email to all users. Combining it would simply lead you over then to start a new campaign and create a new campaign using the direct email campaign tool. What petitioner's actually arguing is a modification of these tools, not simply combination. When the board said – without support, but when the board said that you can expressly combine these two tools, that's not enough because you still must modify the tools, and there's no suggestion of modification of these tools in order to put them together to meet this kind of invention. The problem that the board had, though, when it came to that conclusion at the end that it said that there was anticipation, it relied on one fact, and that was Dr. Yoshi's testimony. The board said that Dr. Yoshi's testimony was that, quote, the campaigns can be used together, but that actually finds no support in the record. First, it contradicts what the board said. The board said, we acknowledge that Paul does not indicate expressly that any of the computer routines in the campaign manager can be used with any of the other campaign manager computer routines. That contradicts what it already found. Second, when you look at what Dr. Yoshi says that the board – It's a matter of law. It can be used together enough. In other words, is it enough for Dr. Yoshi it is here? Yoshi, yes. And Ryan was the other expert on the other side, right? That's correct. Is it enough for Dr. Yoshi to say they can be used together, or do you have to find anticipation to be able to say that the Paul reference necessarily shows that they are, in fact, used together? No, there could be – if it were the case that there was a suggestion in Paul that one could modify these routines in order to apply the targeted emailing to any of these other routines. If that were actually expressed in Paul, that would be a different scenario. We don't have that. If you go to the KineMetal case, for example, in there what happened was you had a claimed invention that was an apparatus with two things. The disclosure in the prior art disclosed two things. They just weren't the exact same things. There were several combinations for what one of those things could be and several possibilities for what the other thing could be. Therefore, because it did expressly disclose that you can put those two together and one of the possible disclosed combinations is the claimed invention, that was anticipation. Here, you haven't reached the first step. You haven't got something in Paul that would combine these two together. That's the first step that the petitioner would have had to find for the board to reach a question. Looking at the 1399 appeal, that's the Patent Board decision, at JA 29 and JA 30, the board expressly referred to paragraphs 29 and 50 of the Paul reference and looked at those two paragraphs to make a finding that what Paul is disclosing is not just individual routines, but Paul is also disclosing combining the various routines in various ways to make a multitude of email campaigns. In that sense, the board has made a finding. It has made a reading about what this reference teaches to one of ordinary skill in the arts. If we conclude there's substantial evidence there for that, then that's what makes this case more like Kenna Metal. Well, Your Honor, I think the board distinguished Kenna Metal based solely on Yoshi's declaration when we pointed out Kenna Metal and argued that this is different than Kenna Metal. In the opinion, the board distinguished that case solely on Dr. Yoshi's testimony. When you look at those two paragraphs in Paul, paragraph 29 is simply boilerplate. To conclude from that, that would be substantial evidence that someone can simply say, everything in this patent, you can combine it in any which way possible, and for that to be able to anticipate future inventions and future technology that no one's even thought of yet, simply because it's possible that you can pick and choose from this reference and someone says, boilerplate, everything in here, you can combine it in any which way, and that's my invention. That would be a rule that would destroy the ability for new inventions to combine new things, old things in new ways, the novel and the non-novel. Well, it seems like this statement is important because if Mr. Paul wanted to write a claim that combined two routines together, he would have written description support for that because he expressly said in his specification that you can combine two or more of these routines that he discloses. Well, your honor, I don't think that would be enough because Paul would need to be more explicit about what it's combining, and boilerplate wouldn't get you there. Paul describes a system that operates in a very specific way, and Refer Friend operates starting in paragraphs 100 through 102. It's described in operating one way. The campaign manager is described overall as combining these two different tools, but then it specifically talks about this direct email campaigning tool beginning on paragraph 60 and continuing through 71. When it describes how these two tools operate, the routines follow a certain path and a certain procedure. Now, simply saying that combining these two routines together isn't going to get you there. It's not enough because all you're doing is stacking one routine on each other, and you complete one routine, and then you finish with the other. What Petitioner needs to show in order for it to anticipate is modify the Refer Friend routine. It doesn't operate in the way Paul describes. Instead of sending it to all members, what you do is you take this piece from the middle of the campaign manager description of the campaign tool on paragraph 64, where it describes how upon selection of the send function, the user must establish which members will be sent. You're taking the middle of the campaign tool 108 and attaching it to the middle of the Refer Friend tool. You're modifying it. You're not simply combining them together. Counselor, you're into your rebuttal time. Do you want to reserve the rest of your time? Thank you, Your Honor. I'll reserve my time. Ms. Steeles? May it please the Court? My name is John Gills, and I'm counsel for cross-appellant Groupon and also appellant Groupon in the case of the 646 patent appeal. I want to address three quick points, address patent owner's commentary about Paul in the written description argument, and also deal with our cross-appeal argument, which focuses on rats no more. First, with respect to Paul, the patent owner doesn't really dispute that the four corners of Paul teach all of the claim limitations, and that is what the Board found. They simply tried to argue that it's in two separate sections of Paul, either the advertising method, which they say discloses targeted advertisements based on demographics, and the Refer Friend method. But I think it's clear when you read Paul, as the Board did, that it describes a single system supported at JA 860-61. That is a system or a computer program that a person of skill in the arts, here a computer scientist familiar with mobile and electronic commerce, would understand to use different tools and different routines. Are you arguing that what we have here is a case of inherent anticipation? No, Your Honor. The Board does not use inherency in its decision at all, and I don't think that inherency is needed. Paul is describing a single system, not just in paragraphs 29 and 50 that Judge Chen referred to, but even if you look at paragraph 100, where it talks about the campaign manager can specifically call the Refer Friend routine. It is a tool within that manager. The campaign manager is actually muted in order to run the campaign and send the email. Contrary to the patent owner's argument, it's not just a tool. I'm sorry, Ms. Gillis. You're not arguing that paragraph 100 or anywhere else in Paul explicitly discloses the combination of the direct email marketing campaign routine with the Refer Friend routine, are you? I do think that that is suggested by Paul. The Board didn't say that, right? I think there's support in the record for that, where it says Paul teaches that Refer Friend routine is a tool within the campaign manager, and you need that campaign manager in order to send out the email. Paul also teaches that the emails don't have to go to everyone. They can be targeted based on demographics. Does Paul teach that with respect to the Refer Friend campaign? I believe it does within the context of Paul. Where does it teach that? If we look at JA 866 or paragraph 51 of Paul, also JA 871 at paragraph 77, if we look at paragraph 50, where it says, Paul states sponsors can add new news items with graphics, web links, or hyperlinks. I'm sorry, what line are you at? I'm sorry. If we look at paragraph 50 of Paul, where Paul talks about sponsors can add new news items with graphics, web links, or hyperlinks, and have the ability to create numerous types of email campaigns, such as Refer Friend campaign, through the campaign manager discussed later. I think clearly Paul has contemplated that the campaign manager of this system can send targeted advertisements to specific users. I'm sorry. I didn't quite pull that out of that sentence you just read. The sentence clearly talks about a Refer Friend campaign. It doesn't say anything about doing the Refer Friend campaign in a targeted customer kind of a way, rather than what is earlier disclosed about just an email blast to everybody. Right. I think you've got to look at multiple sections of Paul together, all of which we cite in our papers. I think if you look at paragraph 50 of Paul, which I just cited to you, if you look at paragraph 86 of Paul, where Paul expressly discloses that when you set up a campaign, the Refer Friend function is available as a tool. When you look at how the board found that Paul teaches all the key elements of the claim, the creating of profiles, ensuring that there's a match condition, providing a subsidy, all of the claimed elements and features. They don't disclose any of that in reference to the Refer Friend campaign, do they? I believe that they do. Our expert, Dr. Yoshi. Is this sentence in paragraph 50 your best sentence? No, no. What's your best sentence? I think, again, you've got to look at several paragraphs of Paul and look at them together. You've got to look at paragraph 29 that talks about Paul being a single system. I think you can look to figure five, which, again, gives a diagramic view of the entire system. You can look at paragraph 50, which talks about the campaign manager being able to send Refer Friend emails. I think you read that in the context of the section of Paul that talks about what the Refer Friend routine is designed to do. I think you can look at paragraph 42 of Paul that talks about how profiles are generated based on geographic data. You can look at paragraph 51 that talks about the match condition for Paul. Is that with respect to Refer Friend campaign? Again, this is a system where all of these items are intended to work together, akin to what PTAB Judge Kim said, it's like if you're using Microsoft Word. What about Mr. Conrad's concern that what you have to do in order to combine the direct email marketing campaign routine, which, in my view, is what you're describing and all those other parts of the spec of Paul, combining that routine with the Refer Friend campaign routine, that you have to do some modifications to the routines in order to get them to operate together? I don't think you need to do that. I think, again, looking at paragraph 51 of Paul, also looking at our record at JA871 paragraph 77, the campaign manager of Paul is expressly taught as having the ability to target his campaign. Can you describe how you would do the combination together? As I understand, Mr. Conrad, he seemed to be saying you do the Refer Friend campaign first routine and then you do the direct email marketing campaign after. I would think it would be reversed.  You would have a subroutine Refer Friend campaign. Is that how it's possible? Is that how? Well, we need to understand for sure how it's possible to see how it matches with the claim. So what would be the combination of the two routines that one would envisage, one of ordinary skill in the art would envisage, in order to read on every single one of these elements in the order that they're presented? One would envision that you would collect the profile and matching data as described in the earlier section for Paul, and then based on the accumulation. Are you talking about the direct email marketing campaign? No, no, no. These are profile information that you can collect, and then the campaign manager has access to and can control that information. And then you can use a Refer Friend campaign to target those particular individuals that you've determined best match the criteria of the advertiser at issue. I think your exchange with Judge Chan illustrates a problem that I'm having with your argument. In Tenemental, we said that you can have this type of a combination of a person's skill in the art. It's not just envision. It's at once envision. And it seems to me that you've jumped around a lot in the Paul reference and you're cobbling together, and with argument, cobbling together the different limitations. And I'm not sure that I would call that, you know, at once envision this combination. I respectfully disagree, Your Honor. I think here we're dealing with someone who at least has a Bachelor of Science in Computer Science, who is very skilled with computer programming and very skilled with mobile and electronic commerce. I understand all that, but show me then. Show me in the reference just by looking at it that you would at once understand the combination. Sure. Like I said, I think you can look at the diagram of the entire system and how the campaign manager is like the brain of that system to run various routines that the system can carry out. The system describes a means for sending targeted advertisements to specific users and a way by which those users can refer those advertisements and get an incentive or reward in doing so. And our expert puts all of that together. And, again, I direct the board to or the panel to JA CITES 860-61, JA 1839-41, JA 5241-45. Again, all the various paragraphs. Excuse me. I'm sorry, sir. JA 5241-5245. All the various paragraphs of Paul that I mentioned, paragraph 29, 42, 50, 51, 53, 100, 86, 57. There's numerous support for Paul being one system and all of the elements being there. 53, 57. Yes, sir. 86, 100, and the subsequent paragraphs that describe how the refer-a-friend routine works. There is substantial evidence. Ms. Gillis, I think you might be making it unnecessarily complicated. I mean, if you just, the board handed you a roadmap. Yes, it did. There's a handful of tools here in the Paul reference. One of them is the direct marketing email marketing campaign. Another one is the refer-a-friend campaign. If you look at paragraphs 29 and 50 of Paul, Paul teaches that not only is he talking about individual tools, he's talking about the combination of said individual tools. Therefore, the board found that Paul teaches combining the disclosed tools. By that disclosure, one of ordinary skill in the art would at once envision the combination of the refer-a-friend campaign with the direct email marketing campaign. Yes, Sean, I agree with you 100%. I think the board summarizes that in its final written decision for the 516, for example, at pages 25 to 27. I was, again, just trying to point the board to the numerous sections in Paul itself which describe to a POSA how the system works, how it's one system, and how these two concepts work together. I want to switch to written description. I was confused by the written description rejection because it seemed to me that what the board could have or should have done is maybe make alternative rejection, either do a 102 rejection on Paul or do a written description rejection because somehow the terms token and tag mean something completely different than link or token and tag are somehow insolubly ambiguous and so there's just no support for these mysterious words. But as soon as you arrive at that conclusion, then I don't see how you can do a 102 rejection. Likewise, if you do a 102 rejection, it's because you know what token and tag mean. They mean a link and Paul teaches a link and that's why the 102 is affirmable. It seems like an either or proposition. I don't see how the board was able to really impose both rejections. I'll address that. We, Groupon, made the alternative argument. We first led with the endorsement tag and token had no 112 support and we believe that and there's ample support for that both in the final written decision and in our papers. We also made the alternative argument that if we did not prevail on 112 or those two arguments could coexist, that the prior art either anticipated or rendered obvious. It sounds like you agree that we can't sustain both rejections. I don't necessarily agree and one of the cases that we cite, I don't have it at hand but we cited I think in our papers, is a decision in which I believe this court found both invalidity based on 112 and based on prior art objections. So I do think there is a world where those two objections can stand side by side. If we first deal with the written description argument, What would the logic be for how those two objections can stand side by side? The query for written description is, is there proof within the four corners of the application that these inventors had possession of what those terms were? And the PTAB does acknowledge that both sides say it could mean a link and part of why Groupon took that position is that was the construction that patent owner had used in the related litigation using the broadest construction for infringement purposes. So we say if that's the construction that the court adopts for purposes of the prior art objection, where is for 112 purposes proof within the four corners that this inventor had possession of these two terms? There's no dispute that endorsement tag and token are nowhere in the 144 application. You asked the question about the timing. That application was filed in December of 2005. It wasn't until an RCE four years later that these terms show up. Endorsement tag and token show up for the first time. I'm still getting to my concern and maybe there's no good answer. All we can do is just say a bunch of words at this point. I don't know. But it seems to me that if you're doing a written description rejection, it's because tag and token mean something different. Different than the disclosed link in the written description. What's your view of what token and tag mean? Because for purposes of the written description rejection, I did not see the board reach any conclusion what token and tag mean. I think it's almost a necessary step you have to do before you conclude that the written description somehow fails to support what token and tag are. I think what the board does is they first analyze whether the inventor had possession of those two terms. The board says they do not. We have to understand what token and tag mean before we can figure out whether the inventor has possession of those terms. They say there is certainly disclosure in the application for what is the link or what is the hyperlink. There are diagrams and there are paragraphs that refer to that. What is missing is saying token equals hyperlink or endorsement tag equals hyperlink. Don't the parties agree to that construction? They say that token and tag equals hyperlink? We agree to that construction for purposes of our 102-103 arguments where we argued in the alternative. The board acknowledges that agreement within the decision. But you don't agree with it for purposes of the 112 objection? For 112, we say even if it did, nowhere do you tell a person of skill in the arts that those two things are equivalent. There's reasons in the record to suggest why they're not. But doesn't that suggest that we need to have a claim construction exercise here of some kind? If the board had said, we conclude based on the arguments of the parties and our examination of the claims and the written description that endorsement tag and token mean executable hyperlink, then that would be one thing. If the board said it concluded that they meant something else, that would be another. Doesn't there have to be some kind of somewhere, either a claim construction that's agreed upon by the parties that a court or the board accepts or a determination by the board as to a claim construction? I do think that the board implicitly makes that construction. If you look at the final written decision for the 516, for example, at page 35 of that decision, they say petitioner asserts, as in us, that endorsement tag should be construed as executable link such as hyperlink and that endorsement tag must be related to an advertiser link with advertising content. And they say that if that's the construction, that there's disclosure. There's not disclosure of saying that word. Endorsement tag could be... But haven't they just said that endorsement tag equals hyperlink? And if endorsement tag equals hyperlink and the hyperlink is disclosed, then... That's us looking at it now. Where in the corners of the 144 does the inventor... If the claim construction is done at the time of the invention, you know. And if the claim construction ultimately is that these terms mean link, then there's written description support. I guess the way I see your argument is, as a matter of law, in your view, the specification needed to take the step of saying, tag and token mean link. But if we disagree with that and conclude that our law stands for the proposition that if you use a term that is never discussed before in the spec, nevertheless, that claim term is discernible based on the context of how it's used in the claim and the context of the written description, then there isn't this... It seems more like an indefiniteness problem in some ways. But regardless, then there would be written description support because we understand what the claim term means and, in fact, it lines up with what is being disclosed. Again, I think I would go a step further than what you're saying. I think we would say, as a matter of law, not only here where the patent owner doesn't say endorsement tag or token means link. Here, we've got claims that use three different terms. We've got claim terms that use endorsement tag, claim terms that use token, and we've got claim terms that use link. For example, claims 25 and 27 use link. Other claims use endorsement tag or token. What about a law like ENOVA, which says, we recognize that there are times where patent owners use different terms in the claim to refer to the same concept. Here, I think, if you look at the prosecution history, the prosecution history undercuts them in a couple of ways. They added those terms because link was rejected as being obvious. So that was motivation for them to come up with another term that meant, in theory, something else to overcome. If you look at the prosecution, though, they did a massive overhaul of the claim. They didn't just delete the word link and then insert the term endorsement tag or token. It was a major overhaul of the claim. So I don't think you can rely on that as some kind of quick suggestion that they were trying to run away from equating endorsement tag with link. I think you've got to look at both the prosecution for the 516 and then look at the subsequent prosecution for the other application. Once they got to patent number 2, the 679 patent, they added additional new content, new disclosure, to support what endorsement tag meant. Why would you need to do that? If there was adequate written description in the 144 application, there was not. Do you want to quickly address your counterclaim given the fact that your time is running? Sure. Again, just the site for some record sites for our written description position, JA-742-759, JA-2828-2829, the Yoshi Declaration... That's the second site. I'm sorry, JA-2828-2829, and our expert, Dr. Yoshi, also gave alternative definitions for endorsement tag and token that don't equal link at JA-1657-58 and the applied medical research case that we cite in our papers as to why use of different claim terms undercuts their position. Okay. Thank you. Thank you, Your Honor. Our cross-appeal solely relates to whether or not the Rathmore reference is a printed publication. Here, I think there's no dispute as to the level of skill in the arts. A person with a computer science degree, facile with mobile commerce, the state of the Internet in 2003 and 2004, the relevant critical date period here as based on a prior art reference that we rely on at JA-1175. Also, there's an existence of a related article, the Rathmore article, from one month earlier at JA-2052-59. And here, I think if you look at the cases that talk about public accessibility being the cornerstone of publication and whether or not a POSA exercising reasonable diligence could have found this reference, I think all the factors and evidence in the case support that a computer scientist, facile with mobile commerce, would have been able to find the Rathmore reference here. This is a better case than Ruckemeyer, the Federal Circuit case cited in our brief, where the court there said a Canadian patent was a road map to deleted patent figures in a patent file. That patent file was in a physical location in one patent office in Quebec. What evidence do you have that the Rathmore reference existed in 2003? That it actually was there in order to be accessible? We have two sets of metadata evidence that are not disputed. We have metadata evidence at JA-1991 and 1992 that shows Rathmore was created in 2003. We have metadata evidence that said that Rathmore... Did the board consider this evidence? It was in the record. The board did not, in my view, adequately consider the wealth of evidence that supported... Was it brought to their attention? Yes, it was, Your Honor, both in oral argument and in many of the papers. That second set of metadata evidence shows that Rathmore was on the web server no later than October 2004 at JA-2028, which is prior to the critical date here. So there's no dispute that it was there at the relevant time period. On a public website, we're talking about a major university, University of Maryland, Baltimore County, computer science, EE department. Well, that's the question. The concern I saw the board having was that there was no evidence that this particular page with this publication was indexed, right? To the extent that a search engine would be able to find it. Now, if you were to tell me that you could go to the official UMBS website that would have a link to the computer science department and then the computer science department's webpage would have a direct link to Rathmore's publication page, which then has a link to the paper, then that would be something to suggest that this particular link with this paper has been indexed or could be indexed. But right now, what is missing from the record, and this is what the board seemed to be harping on, was any suggestion that this particular page was findable by search engines. And this is the point that I think our court was making in voter verified where we did find that online reference to be accessible, but not because there was evidence of indexing, because there was no evidence of indexing in that case. Instead, it was because that particular webpage was known to those of skill in the art as a place to go to find interesting things in that relevant field, which is lacking in this particular instance with respect to Rathmore's publication page. I wanted to address voter verified. First, I want to say that we have unrebutted testimonial evidence from Dr. Yoshi that as of 2003, at that particular web link, this article or report was available to the public for viewing and downloading. That testimony was not challenged. The board, I think, didn't challenge the question of whether it was available at that particular URL address. The board agreed on the fact that nobody of skill in the art would know how to get to that URL address because there was no evidence of indexing nor was there any evidence that one skill in the art would know about this particular URL address and then consult it. And I can address that. Again, I think the facts in our case are stronger than voter verified. Again, voter verified dealt with the Benson article, which was an online periodical from the mid-'90s time frame. So we're talking about as of 1999, and there the court said that And even though there was no evidence in voter verified that that particular article was specifically crawled or indexed, similar to us, in voter verified, the court still found that it was publicly accessible. So now let's look at the time frame. In voter verified, there was sufficient proof that the article was there. And we have sufficient proof. The question was whether it was available or accessible. There's got to be more than showing that it's there. Your problem is, I think, that you haven't shown there's an evidential problem whether the article was actually there. And your expert says, well, it was around or says it was around November of 2003 and queried whether that's substantial evidence that it was there. I don't think the board quibbled with whether or not it was there. I think both Yoshi's testimonial evidence showed that it was there. The two sets of metadata evidence that were undisputed, not challenged by patent owner, showed that the article was there and available. The question the board had was, could a POSA locate it? Our response is, yes. This POSA, a computer scientist in 2003,  where you've got a group of authors. If you compare the front page of the Ratsmore report to the front page of the related Ratsmore article from one month earlier, you've got identity of authors. You have their titles, their job locations, their email addresses. If you look at the articles... Just to clarify, because there's a couple different things going on. You're making an argument about the research aid notion, right? You're not making an argument that this website had been indexed or that this website was really popular among those of ordinary skill in the art. They would already know to go to this URL address, right? You're focusing on research aid. I'm making both of those arguments. Let me try to separate them. Yes, this was a website that I think people of skill in the art would have gone to. It is a major university website. It is the computer science and EE department of that website, and it is the location of multiple authors, professors who are known in this space to be working on these topics. They have published on e-commerce. You want to wind up. You're out of time. Yes. Again, voter-verified indexing was not done in that case. That was 1999. We're five years later with the critical date here where search engines are advanced and we're talking about a major university website and computer science folks. When you look at the research aid of Cornell or Ruckelmeyer, clearly the Rasmore article at 2052 was a sufficient research aid where that article was downloaded more than 4,000 times. A person of skill in the art would have been motivated where that article said we are doing more work. We're getting government funding. We are expanding on this. A person of skill would have been motivated to look up Dr. Rasmore, go to the UMD site. If you plug in her name, you get to either ubiquity, publication. You're making new arguments, and I did ask you to conclude. I'm going to restore you back to five minutes for your rebuttal, because we took down the questions. Thank you very much. Thank you, Rainer. Thank you, Rainer. Your Honors, may I please the court? The Director intervened in these cases to address the Board's initial determination. As Blue Calypso did not address that issue in its opening, we request that the court affirm the Board's initial determination that Blue Calypso's patents are covered business method patents subject to CBN review. Just a quick question. What's the difference between a covered business method and a business method, one that's not covered? A covered business method and one that is not covered? Right. A covered business method patent includes any sort of data or processes that include a financial component. And so in that sense that whether or not there is something that uses a data processing or a management system in the financial sector or industry. But as the Board found and as the regulations include, that determination is not just limited to the financial sector. But could you explain what would be an example of an uncovered business method? Of an uncovered business method? Yeah. I mean, it says covered business method. And as I understand Judge Rayna's question, that means it's likely uncovered business methods. So what kinds of business method patents are not eligible for the covered business method patent proceeding? If the business method did not have anything to do with the practice, administration, or management of a financial product or service, then I guess it would not be a covered business method patent. Or if it was a technological invention, then it would not be a covered business method patent. Did you say that all business patents have a financial sector to it or a financial purpose to them? All business methods? Yes. Well, here the determination is directed to the claims themselves. So to the extent the claims themselves have a financial component, it would be a covered business method. But to the extent that they don't, they would not fall under that definition. Does that answer your question? That's okay. You can go on. Yeah. I'm just curious. What kind of patent that relates to commerce would not qualify for covered business method patent? Or another way of putting it is, is it the agency's view that anything related to e-commerce is a covered business method patent eligible for this proceeding? I think any patent that claims e-commerce that includes a financial component would be covered by the covered business method patent definition and would be subject to CBM review. So it is a broad definition, and e-commerce patents such as the ones that are at issue here are the type that would be covered by the CBM definition and subject to CBM review. What about a patent, for example, that would help a business owner determine whether they locked the doors at night or not? Would that be a covered business method patent? Well, to the extent that claims themselves included something that also had a financial aspect to it, then I think they would be covered. But you would have to look at the claims themselves. In that hypothetical, you're asking me what the patent is generally directed to. But what the board does is look at the claims themselves to determine whether or not it is a covered business method patent within the definition. The example I gave you, the business owner's concern about losing, having somebody break in or steal things. So I'm just curious whether that business patent has a financial sector in it or not in your mind. Well, I think, again, to the extent the claims themselves had some sort of financial component to them. But the business patents. I mean, these are businesses. So don't they all have some sort of financial component built into them? Well, the CBM proceedings were instituted to address a specific type of patent that... That's my point. I agree. Okay, what type of patents do they not address? They would address patents that would fall out of that definition. So, and to the extent in your hypothetical, if the business method relates to protecting homeowners from people who are breaking into their homes... The business owners. The business owners. If there is nothing in that claim that brings in the definition that the Congress  then it would not fall under the definition of a covered business method patent. One question on the regulation for technological invention. I mean, I saw a part of the regulation say that a condition to be a technological invention or not a technological invention and therefore institute one of these proceedings is to see whether the patentable advance in the claim is technological in nature somehow. And I was just wondering, why is it reasonable that something that seems to be a merits-based final determination would be a basis for figuring out whether to institute the proceeding in the first place? So, the technological invention aspect is an exception to the CBM proceeding and the reason the board looks at that issue is because there are certain patents where although they may have a claim that's directed to a covered business method itself, there's something else in that invention that I guess will lift it out of that arena and have a technological aspect to it, wherein there is something that they're using, whether it be a new type of software or a new type of routine or anything that is not within the norm of the technology in that area that will lift it out of the CBM definition. But as I understand it, this is a merits-based determination, right? Well, the final determination is a merits-based determination. But in terms of understanding the regulation for instituting one of these proceedings, it very much looks like a merits-based conclusion that there is or is not a technological patentable advance over the prior art. Am I misreading the regulation? Well, the board is not making a 102 or 103 determination at that point. All the board is doing is looking at the claims themselves and determining if those claims bring forth some sort of technological idea or notion that would lift it from the CBM definition. So they're not making a merits-based determination based on 102 or 103 at that point. They're comparing it to the prior art though, right? They're comparing it to the prior art in the sense is, is there anything that's only generic to the claim? I mean, generic in the sense that it's generic to the technology of the claim. In the claims at issue here, all the technology that was related to in the claims was generic in nature. And there was nothing that was new in the terms of the technology that was used. Anything you want to add in conclusion? No, that is all, Your Honor. I yield my time. Thank you. Thank you, Your Honor. I'm first going to address the issue of Ratsimore. There's two failures of proof that the petitioner has here. The first, as you heard during argument, was the issue of was there a roadmap that would lead an interested researcher ultimately to the destination where this paper may have been. And there's just simply no proof in the record. And this is the problem the Board had. There's no proof in the record of how one could get to that paper, whether it's by indexing through search engines, whether it's by following some path or series of links or anything. There's just no evidence at all. And this wasn't something that would have been difficult to do had there, in fact... Ms. Steelitz was saying that the UMBC Computer Science Department, a significant department doing research in this area, and therefore one of ordinary skill in the art, would be inclined to go digging through the computer science website in order to see what's going on and then ultimately find Ms. Ratsimore's page. What's your answer to that? I mean, how is that any different than... First off, how is that any different than saying that it would be enough for someone to be able to go digging through some library somewhere to find a book that's on the shelf but has not been indexed or cataloged? You'd have to go through every single stack to find these books. In that situation, there's no public accessibility or availability there. Is there anything in the record that shows that when you're at the Computer Science Department's website, there's a link from that website, the Computer Science Department's website, to Ms. Ratsimore's publication page? During the relevant time, there's zero proof that there's any link at all to Dr. Ratsimore's personal web space. And it's only in her personal web space where this paper is eventually found. We know it's found today. You'd have to know the specific URL address in order to get there. You wouldn't be able to get there through the Computer Science Department's website. That's right. But based on the record today that was presented to the Board, when you look at what there was at the relevant time, any relevant time for these patents, what would take someone from the main page of the Computer Science Department all the way to eventually where the patent was ultimately found,  Now, that would not have been a difficult thing to do. We raised this issue during the proceeding, and Petitioner has an expert who wrote the paper and is still a professor at this university. All he did was say in his original declaration this was available somewhere on the website in 2003. He did not come back in his supplemental declaration and provide more proof, a full listing of proof, which he was in full control of to be able to do. This is how it works. This is what the website looked like. This is where people would have gone to. This is where someone would have been led to. This is how we would have followed links. The simple conclusion from all this lack of proof is that that trail didn't exist. So even if you assume someone would have been wanted to follow the trail, the trail didn't exist at the time. There's no proof of that. That's the issue with the trail. There is no proof. The second issue is, as I alluded to, time. I think Petitioner raised one issue of a bio page that had a link on Dr. Ratzemore's official bio page. There's no proof that that is how the page ever looked prior to 2004. That's something that Dr. Yoshi, their expert, could have testified to if it were true and that there was actually something available. But that's just not the case. There's no proof there. As the panel noted, Dr. Yoshi's testimony is really the only thing that suggests that this paper was available on this website at the time. All he says is it was available, and that's even contradicted by the fact that the official website doesn't list this paper. The project page doesn't list this paper. The only person that lists this paper is Dr. Ratzemore at some point in time, and that's on a personal site. What about the research aid argument with respect to the Ratzemore article stating that this Ratzemore team was doing a lot of further investigation and work in this very area, and therefore one of ordinary skill would have been motivated to go looking around for what else Ratzemore was up to? You're talking first about a significant jump of being able to follow a trail, and then second, there's no proof that the trail ultimately would lead you there. The Ratzemore paper in October of 2003 only lists the names of the authors and their university. It doesn't cite the reference, the Ratzemore reference that was at issue. It doesn't say it exists. It doesn't cite a website address. It doesn't cite a project address. There's nothing that would lead someone directly to the university's website, and then ultimately, how would they get to this publication? You just can't follow that path. That's different than the case law, where, for example, I forget the name of the one case, but there was an explicit reference to this paper that was at issue in the prior art, and one would have known that that paper existed and could have sought it out. Here, no one would know that this paper existed from the October 2003 publication. Ultimately, this comes down to a judgment call by the board, the reason being that there are a lot of factual issues here that were weighed. It's not simply an area where the parties agree on what the relevant facts are, and we can work on the law based on that. Here, the petitioner was relying on Dr. Yoshi's testimony. We presented evidence that that was unreliable and incorrect, that the paper wasn't available on the official website. They presented hearsay evidence of particular dates at various times, 2003, 4, 5. They argued 2007. The reliability of those dates, what they mean, that was all a judgment call for the board to make. Those aren't... Could we repeat the argument concerning the metadata evidence? Very simply, Your Honor, metadata evidence is evidence of the creation of those documents, but not any evidence of dissemination or availability. The fact that the document was created on a computer doesn't indicate in any way that it could have been accessed by anyone outside of the computer at any particular address. All it was is it's created, not disseminated. Does that answer your question? Okay. And briefly, I'd like to get to the written description argument. The only evidence that the petitioner offered is that the words are not the same. That's a failure of proof. Our expert at 4735 in the 516 Appendix offered testimony about how he would have viewed, how he looked at the specification, would have understood and come to these claims. Petitioner's expert could have contradicted that, could have rebutted that, but she was silent on how one actually construes these claims. All you're left with is the fact that the words are different, and that ultimately is a failure of proof, and this panel can reverse the decision, doesn't have to remand it. Finally, on Paul, I'd like to point out that the campaign manager is the overall program. You've got to be very careful about that. When you refer to that, you're referring generally to the overall program. Element 108 is the campaign tool. That's the direct email tool with the demographic targeting. The refer friend tool is a separate tool. We don't want to confuse this overall campaign manager with the two distinct tools that are explicitly described in how they operate. If there are no other questions, thank you. Thank you very much. I want to start briefly with Ratsamore. Again, if you look at what's in the record at JA453, what Pat Nonner calls the official university ubiquity website, that website, if you click on people and you put in Ratsmore, you get this page, which is in the record at JA453. That page has the same URL link that Dr. Yoshi refers to in his declaration. Did JA453 exist in 2003? This is an alumni page, right? This identifies her as an alumni. This is a website about ubiquity, which is the- Right, but I'm seeing here that says alumnus graduation date May 2007. This seems to have been a particular page created after May 2007. No, sir. The ubiquity is a section of the UMB website which organizes papers in this e-commerce, mobile commerce area. It identifies Dr. Ratsmore as an alumnus because as of the present day, she is no longer with the university. But proof that this page would have looked virtually identical, particularly what is that the URL would have been virtually identical, that same URL link that you would get when you pull up the UMBC ubiquity site, click people, one click to Ratsmore, and you go to this URL, which is a hot link to her publications page. This same hot link is the hot link that Dr. Yoshi in his declaration said where the article or report was available for viewing. In 2003? Yes, where he says in 2003, this report was available and we have in the record at JA833 that that page was last updated in 2005. So this is not something that is being done in present day. This is all prior work. This is a better roadmap than what was in Cornell and Bruckenmeier because again... Where did Dr. Yoshi say that the page of JA4543 existed in 2003? What he says is that the report was available... The paper, right? The paper. The technical report was available at this link. So what I'm saying to you is where this link and what is on that link was last updated in 2005. That suggests its existence prior to 2005. Right. The link that this webpage refers to existed in 2003. But I don't see any evidence in the record that anyone testified that this page with this particular address existed in 2003. What I'm saying is Dr. Yoshi testified that this link that is shown on this page existed in 2003 and that that link is where you could get the report. What we also have in the record is the metadata to show that the report was there. What we additionally have in the report was that that page at this link was last updated in 2005. Does the metadata show that the report was there or simply when it was created? It shows two things. We have metadata evidence that shows it was created in 2003 at one record site and we have metadata evidence and that first metadata evidence is at site JA-1991 and 1992 and then evidence that it was on the server at least as of October of 2004 at JA-2028. Again, part of the environment that we're in is the ubiquity site is where these particular authors collected their work related to this subject matter. If you go to UMBC and you type in Rathmore, you might get this page. If you go to Rathmore, you might get her ubiquity page. You're one click away from the technical report, at most two. This is better than the roadmap in Cornell and Bruckenmeier where you had to have an article in hand online and then go to an office, a physical location. We're talking about two or three clicks. Is there any evidence of anyone actually having access to the article by following the link that you're citing? I think through the exercise of reasonable diligence, any of the number of 4,000-plus people where it's in the record that more than 4,000 downloads of the related Rathmore article where you could find that article on the same publication page where the technical report exists, it is certainly reasonable to conclude that a POSA exercising reasonable diligence under Voter Verified would have found it and would have been motivated to find it where the article says, we're going to build on this research, we're going to do more, we're getting government funding. What we have to decide is whether the board had substantial evidence to conclude the opposite, right? And I don't think they did, Your Honor. I think the substantial evidence is better than Voter Verified, better than Bayer, better than Cronin, better than Bruckenmeier. Briefly on Paul, again, the patent owner is making the false argument that they're two completely separate systems. Again, Paul discloses how to store profiles, how to use the campaign manager to start a campaign, how to then tell the campaign manager to direct the campaign at specific individuals based on profile data that you've collected, and how to use the Refer Friend Tool, which computer programmers know programs have tools and routines that can be called to do that. The board found that and a POSA would have understood it and been able to combine it. A written description. Ms. Stills, can you conclude pretty soon? Yes, Your Honor. You're in your rebuttal on your cross-appeal, right? Right now? Yes, you're probably right, so I probably need to... With that, unless there's any further questions, we would ask that the panel reverse the board with respect to Rathmore and find that Rathmore either alone or with the cited references renders the challenge claims invalid. Okay, thank you. We thank the parties for their audience and we'll take it under revival.